```
                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
                  BEFORE THE HONORABLE ALLISON CLAIRE

UNITED STATES OF AMERICA,

            Plaintiff,
vs.                                  Sacramento, California
                                     No. 2:18-CR-00024
                                     Friday, May 11, 2018
DONTE ROBINS,                        2:30 p.m.

            Defendant.
_____/


                               --oOo--
                      TRANSCRIPT OF PROCEEDINGS
                RE: DEFENDANT'S MOTION FOR BAIL REVIEW
                               --oOo--


APPEARANCES:

For the Government:       OFFICE OF THE U.S. ATTORNEY
                          TIMOTHY DELGADO
                          Attorney at Law
                          501 I Street, Suite 10-100
                          Sacramento, CA  95814

For the Defendant:        OFFICE OF THE FEDERAL DEFENDER
                          LINDA C. ALLISON
                          Attorney at Law
                          801 I Street, 3rd Floor
                          Sacramento, CA  95814

Court Recorder:           JONATHAN ANDERSON
                          U.S. District Court
                          501 I Street, Suite 4-200
                          Sacramento, CA  95814

Transcriptionist:         KACY PARKER BARAJAS
                          CSR No. 10915, RMR, CRR, CRC
                          501 I Street, 4-200
                          Sacramento, CA  95814
                          kbarajas.csr@gmail.com
```

*Proceedings recorded by electronic sound recording; transcript produced by official court reporter.*

1        SACRAMENTO, CALIFORNIA, FRIDAY, MAY 11, 2018, 2:30 PM
2                              --oOo--
3            THE CLERK:  Calling 18-CR-24-GEB, United States versus
4    Donte Robins.  This is on calendar for defendant's motion for
5    bail review, your Honor.
6            MR. DELGADO:  Good afternoon.  Timothy Delgado for the
7    United States.
8            THE COURT:  Good afternoon, Mr. Delgado.
9            MS. ALLISON:  Good afternoon, your Honor.
10   Linda Allison from the Federal Defender's office for Donte
11   Robins.  He's present in custody.
12           THE COURT:  Good afternoon, Ms. Allison.  Good
13   afternoon, Mr. Robins.
14           THE DEFENDANT:  Good afternoon, ma'am.
15           THE COURT:  I have reviewed the defense motion and the
16   bail review report from Pretrial Services as well as all of the
17   underlying Pretrial Services reports in this matter.
18           Ms. Allison, it's your motion, so I will allow you to
19   argue.
20           MS. ALLISON:  Yes.  So I have a few things to say
21   about what didn't work out before and why it didn't work out.
22   I think you're aware that this was the residence that was
23   approved originally, but there was an issue with the
24   defendant's mother, who is present.
25           THE COURT:  I wouldn't say it was approved.  It was

1 being considered.

2 MS. ALLISON: Yes. It was considered by Pretrial. At
3 that time his mother, who is in the courtroom, was living
4 there, and Pretrial indicated that they weren't comfortable
5 with that arrangement. His mother, before my last motion has
6 since relocated to the Bay Area where she is working. She no
7 longer lives there. Deshane Jackson, who is his cousin who
8 lives there, she drives a city bus full time. I spoke to her
9 about the hearing to confirm that she's still willing to do all
10 of this. She is. She couldn't be here today because she's at
11 work.

12 I also wanted to let the Court know that, as far as I
13 am aware, I haven't spoken to him for over a week, I think, but
14 Larry is also still willing to sign if the Court wanted, but he
15 was not willing to have the defendant in his home.

16 And what I do want to say about that, your Honor, is
17 it is a big responsibility. Mr. -- this is not the usual case
18 where somebody comes and fends for themselves in the home,
19 right? Mr. Robins is blind. He needs additional care in the
20 home. So he needs somebody who's willing to take that on. You
21 have somebody living with you who's bumping into furniture and
22 needs help getting oriented, who needs help with food
23 preparation, who needs help with somebody telling him where
24 things are on the plate. So I think the fact that it's taken a
25 while reflects not that people think he's going to flee but

1  that it reflects the reality which is that it's a
2  responsibility to have him in the home.
3      With regard to the state case, I know there was some
4  proffers made about what went on in that case, but the fact of
5  the matter is he was released in that case OR in Nevada.  He
6  was living in California.  Went back, made his court dates.  It
7  resolved with a misdemeanor plea, and he was in the process of
8  finishing everything.  He had done the safety classes.  He had
9  paid the fine in full.  He was arranging community service
10 which took some doing, and he was arrested on this case.
11     So the judge had a hearing I believe it was back in
12 February in the case.  His public defender appeared.  He was in
13 custody here.  And the judge said, I'm just going to vacate the
14 requirement for community service, and the case is closed.
15     So he doesn't have any orders, restrainings, anything
16 related to that case still pending.  So there's no reason that
17 he would even need to go back there or that it would re --
18 interfere with his release in any way.
19     Also it gives you some sense of Nevada's feeling about
20 the seriousness of what went on there, the fact that they've
21 closed the case with a misdemeanor.
22     And then two other things, your Honor.  First, he's
23 not a flight risk.  I mean, he needs help to get around.  He
24 wouldn't be able to drive anywhere.  I think it's unusual in
25 this case the fact that he just -- he wouldn't be able to flee

1  anywhere without help.  And that coupled with the fact he's
2  made his court appearances in the Nevada case I think speaks
3  volumes about the risk of flight.
4           As far as dangerousness, your Honor, I understand
5  there are serious charges, and you need to take that seriously.
6  But he doesn't have much of a prior record.  He has the prior
7  misdemeanor.  That's all.  And I do want to point out that his
8  co-defendant, the other co-defendant who was arrested in this
9  case was released almost immediately.  He didn't have the same
10 issues of his physical disability holding him back.
11          And then I think I set forth in my motion what the
12 conditions are like for him at the jail but it's horrendous.
13 He has his cane now but -- and I --
14          THE COURT:  It sounds horrendous.  What I can consider
15 on a motion for bail review is new information that changes the
16 risk of flight and dangerousness calculus, and, you know,
17 overcomes the findings previously made, and the challenges that
18 Mr. Jackson is facing in the jail don't seem to me to be
19 cognizable either as matters going to flight risk or to danger
20 if released.  So I'm not unsympathetic, but I also don't think
21 that those are changed circumstances that can be considered on
22 the motion for bail review.
23          I will also say that some of what you're telling me,
24 Ms. Allison, is information that was known to Judge Newman, so
25 I'm going to disregard it.  I can only look at what's new since

1    Judge Newman made his decision.  And that's the current release
2    plan that's being proposed is what's new, and it involves
3    Ms. Jackson's third-party custodianship.  And the reason
4    Pretrial doesn't support that is that she turns out to have
5    more of a criminal history than she acknowledged to Pretrial.
6    And that's why I am so far unconvinced.
7              Do you have anything to say in response to that?
8              MS. ALLISON:  I have not spoken to her about that.  I
9    don't know what her record is.  I haven't run her rap sheet.
10   But they all seem in the past.  She does drive a city bus full
11   time, and I'm -- you know, finding a place for him to live and
12   somebody who's willing to take that on, we really do need to
13   look at family.  And so she's willing to allow him to live
14   there, and she's also willing to abide by whatever rules
15   Pretrial sees fit to impose.
16             The only thing I would say about the jail, your Honor,
17   is he hasn't spent this kind of time in a jail before.  And
18   since his first hearing, I think this is -- he would be highly
19   motivated to obey all the Court's orders because this is not
20   where he wants to end up again.
21             THE COURT:  Yeah.
22             For the government?
23             MR. DELGADO:  Your Honor, I just want to focus in on
24   what has essentially changed, the status quo from the two prior
25   bail review hearings we have appeared for.  In this case,

1    Ms. Jackson has been proposed as essentially a third-party
2    custodian.  As with Ms. Zenobia, her last name is escaping me
3    right now but Mr. -- I'm sorry -- Mr. Robins' mother, when she
4    was proposed as a custodian, she misrepresented to Pretrial
5    Services the full extent of her criminal history.  Here we are
6    the third time around and the third-party custodian has done
7    likewise.
8           The biggest concern I guess that I would have, aside
9    from what's already been amply laid out in the Pretrial
10   Services report, the May 2017 incident in Las Vegas, that
11   was -- and I made a proffer in great detail before Judge
12   Newman.  I won't do that here because I think it's captured by
13   the documents.  But for the most part, Mr. Robins discharged a
14   firearm.  There were two to three rounds fired within the
15   firearm (sic) because he thought some strangers, some intruders
16   were in the firearm (sic) beating on his children and then
17   poking him on the shoulder.  He told the children to get behind
18   him at which point he then fired this weapon into a wall and a
19   window.
20          The oldest child confirmed that there was no one
21   within the apartment at any time, and there was no evidence
22   suggesting otherwise.  It's that lack of judgment or I guess
23   tenuous connection to maybe what's happening in the real world
24   that gives the government great pause about them placing
25   Mr. Robins in a living situation where my understanding is that

1   Ms. Jackson has three children living in this home as well.
2   And so Mr. Robins, to the extent that there are any concerns
3   about Ms. Jackson herself, her suitability, Mr. Robins simply
4   should not be placed in a living environment where there are
5   children around given his lack of judgment as evidenced by the
6   May 2017 incident.
7          I can answer any additional questions that your Honor
8   has, but I will submit on that.
9          THE COURT: Anything further, Ms. Allison?
10         MS. ALLISON: I don't really agree with everything
11  that he said about the incident, and I think there were some
12  extenuating circumstances which is why this pled out as a
13  misdemeanor. That said, the judge in that case ordered him to
14  take gun safety classes to remediate that and he did. He will
15  not -- and he was at that point still allowed to have firearms.
16  He has no felony priors. He is no longer allowed to have
17  firearms. Ms. Jackson does not have any firearms in the home.
18  So there wouldn't be any risk of that happening.
19         That was a -- not a good situation, but it's not one
20  that we have any reason to believe would repeat itself. It was
21  not done in anger. It was -- it was a mistake, and it was a
22  mistake in his interpretation of what was happening, but it was
23  not something where he lost his temper and has a problem
24  controlling his temper or something like that. It was a
25  mistake, and it is something that is not likely to repeat,

1  especially in a home with no guns.  He does have children.  He
2  doesn't have any restraining orders from being around his
3  children.
4              MR. DELGADO:  Your Honor, if I could simply add at the
5  time of the charged conduct Mr. Robins was under essentially a
6  stay-out-of-trouble which would be equivalent to a
7  no-new-law-violations condition of probation.  He had an
8  uncanny ability to travel between Sacramento, Manteca, and then
9  Victorville throughout the lifespan of this investigation.  I
10 think the Court has read the complaint.  I won't belabor that.
11             THE COURT:  What concerns me about the proposed
12 residential plan isn't so much the presence of the children,
13 but I'm very concerned, not simply about the criminal history
14 that the proposed third-party custodian has but the fact that
15 she wasn't honest with Pretrial Services about it.  I can't
16 have any confidence that she would perform the duties of a
17 third-party custodian in light of that history.  And primarily,
18 for that reason, the motion's denied.  Thank you folks.
19             MR. DELGADO:  Thank you, your Honor.
20             (The proceedings concluded at 2:44 p.m.)
21                             --oOo--
22
23
24
25

1   I, Kacy Parker Barajas, court-approved transcriber, certify

2   that the foregoing is a correct transcript from the official

3   electronic sound recording of the proceedings in the

4   above-entitled matter.

5

6   /s/ Kacy Parker Barajas          Date:  May 18, 2018
    _____
    KACY PARKER BARAJAS
7   CSR No. 10915, RMR, CRR, CRC