# Exhibit F
# DOJ Henthorn Policy

# Memorandum



| Subject | Date |
|---|---|
| Criminal Discovery Policy | October 13, 2010 |
| Crim. Div. Policy No. 10-07 | |

| To | From |
|---|---|
| All Criminal AUSAs | Laura E. Duffy *KD* for<br>United States Attorney |

## I.

## INTRODUCTION

Complying with discovery obligations is a paramount obligation of all prosecutors. Ensuring such compliance requires prosecutors to develop and implement a plan to preserve, collect, store, and review all potentially discoverable information for possible production in every case.

This memorandum sets forth this office's policies and procedures regarding discovery compliance. This policy does not create new discovery obligations. Its purpose is to ensure compliance with existing discovery obligations and to provide uniform standards for handling discovery within our office.[1]

## II.

## KNOWLEDGE OF AND COMPLIANCE WITH EXISTING LAWS, RULES AND POLICIES

Prosecutors must have a working knowledge of a federal prosecutor's discovery obligations. The sources of these obligations include:

1. Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972) and their progeny;

2. Federal Rules of Criminal Procedure 16 and 26.2;

3. The Jencks Act (18 U.S.C. § 3500);

---

[1] This policy is for internal guidance only and is not to be distributed outside of this office or cited in any pleadings. It is protected from disclosure and review by the work product doctrine and other applicable privileges. This policy provides prospective guidance only and is not intended to have the force of law or to create or confer any rights, privileges, or benefits. See United States v. Caceres, 440 U.S. 741 (1979).

    4.      United States Attorney's Manual Sections 9-5.001 ("Policy Regarding Disclosure of Exculpatory and Impeachment Information") and 9-5.100 ("Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses ('Giglio Policy')");

    5.      <u>Guidance for Prosecutors Regarding Criminal Discovery</u> (Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, dated January 4, 2010);

    6.      United States Attorney's Office for the Southern District of California Criminal Division Policy 97-03 (revised) ("<u>Henthorn</u> Policy and Practice").[2]

Prosecutors are encouraged to consult the "Discovery" topic on USABook for the latest Department of Justice policies and guidance on criminal discovery.

### III.

### GENERAL DISCOVERY POLICY

It is the policy of this office to provide broad and early discovery subject to any countervailing considerations.[3] Pursuant to this policy, this office will produce discovery beyond that required by law in most cases.

Although we typically will provide broad discovery, we do not provide unlimited discovery. A prosecutor therefore should never describe the discovery provided in any case as "open file."[4] Instead, a prosecutor providing broad and early discovery should expressly advise the defense that the United States

---

[2] Prosecutors are reminded that discovery obligations may also arise out of notices given pursuant to Federal Rule of Evidence 404(b) (other crimes, wrongs, or acts), and Federal Rules of Criminal Procedure 12.1 (alibi defenses) and 12.2 (insanity defenses).

[3] Cases involving national security, including terrorism, espionage, counterintelligence, and export enforcement, can present unique and difficult criminal discovery issues with far reaching implications for national security and the nation's intelligence community. Such issues also may arise in other criminal cases, such as drugs, human trafficking, money laundering and organized crime. The Department of Justice has developed special guidance for those cases, which is contained in Acting Deputy Attorney General Gary G. Grindler's September 29, 2010, memorandum, "Policy and Procedures Regarding Discoverable Information in the Possession of the Intelligence Community or Military in Criminal Investigations." Prosecutors should consult that memorandum, the Chief of the National Security and Cybercrimes section, and the National Security Division of the Department of Justice for guidance on criminal discovery in these cases.

[4] Such a statement does not accurately describe either our general discovery practice or the discovery provided in a particular case. It may also expose a prosecutor to an accusation that the scope of discovery was misrepresented if an inadvertent omission was made or if the prosecutor's definition of "file" is different from the defense attorney's.

is electing to produce discovery beyond what is legally required given the present circumstances of the case, but is not committing to any future discovery production beyond what the law requires.

There are valid case-specific reasons to limit or delay production of certain discovery to that required by law. These reasons include, but are not limited to, national security, ensuring victim and witness safety, preventing obstruction of justice, preventing the unnecessary disclosure and dissemination of sensitive and/or confidential information, protecting ongoing investigations, and honoring investigative agency concerns. In such cases, prosecutors should consider submitting potential discovery for in camera review by the court and/or obtaining a protective order governing its handling by the defense.

Prosecutors planning to deviate from the general office policy of providing broad and early discovery should have specific reasons for doing so and should typically consult with a supervisor and/or the Discovery Coordinator.

### IV.

### **PROCEDURES FOR DISCOVERY COMPLIANCE**

Complying with discovery obligations requires advance thought, careful planning, and a methodical approach. To ensure discovery compliance, a prosecutor should typically (1) identify all members of the prosecution team, (2) review all potentially discoverable information in the possession of those agencies, (3) produce all discoverable information (4) on a timely basis, and (5) maintain a record of discovery production. Each of these steps is discussed below.

#### A.    Where to Look: Identifying the Members of the Prosecution Team

The first step in determining a prosecutor's discovery obligations is to identify all members of the prosecution team. The prosecutor will then be in a position to collect and review all potentially discoverable information from each of those agencies.

Members of the prosecution team include all federal, state, and local agencies that participated in the investigation and/or prosecution of the criminal case against the defendant. In determining whether an agency is part of the prosecution team, prosecutors should consider whether the agency (1) conducted or participated in a joint investigation or shared resources in the criminal investigation, (2) played an active role in the criminal investigation (e.g. by participating in arrests, searches, interviews or case strategy), (3) shared information with or obtained information from criminal investigators, and (4) obtained information solely to help the criminal investigation. Other factors to consider are the degree to which (5) decisions were made jointly regarding civil, criminal, or administrative charges, and (6) the interests of the parties in parallel proceedings diverge, such that information gathered by one party is not relevant to the other party.

Cases involving parallel proceedings or multi-district investigations can present difficult issues in determining the scope of the prosecution team. In parallel criminal and civil proceedings, prosecutors should apply the above criteria to determine whether to treat agencies that assisted in the civil investigation as part of the criminal prosecution team for discovery purposes. In cases related to an investigation and/or prosecution handled by another district or a Department of Justice litigating component, prosecutors should consider the possibility that potential discovery exists in other districts. Prosecutors are encouraged to

consult with their supervisor and/or the Discovery Coordinator when determining the scope of the prosecution team in parallel proceedings and multi-district litigation.

### B.    What to Review: Identifying Potential Discovery

Once prosecutors have identified the members of the prosecution team, prosecutors should collect and review all potentially discoverable information possessed by those agencies. Specifically, as part of their trial preparation, prosecutors should typically review the following materials:

#### 1. The Agency's Investigative Files

Prosecutors should review the investigative files of all members of the prosecution team to ensure that all discoverable information has been produced to the defense. If such individualized review of the entire file is not practicable, prosecutors should establish an alternate protocol to ensure an appropriate review for all potentially discoverable information by a qualified member of the prosecution team.

#### 2. Confidential Informant (CI)/Witness (CW)/Human Source (CHS) Files

For cases involving human sources, prosecutors should typically review the agency's human source and intelligence files. These files may contain exculpatory or impeachment evidence such as (1) promises, payments and other benefits provided to the human source, (2) information about other charged and uncharged crimes that the human source may have committed, (3) information bearing on the human source's truthfulness or bias, (4) whether the human source has mental health or substance abuse issues, or (5) information relating to a potential entrapment defense. The human source and intelligence files may also contain Jencks Act statements such as correspondence, notes of conversations, emails and text messages.

Human source and intelligence files contain sensitive information tightly controlled by the agency. Prosecutors may need to review those files outside of this office if required by agency policy or the circumstances of a specific case. Prosecutors should typically provide the agency with advance notice of the prosecutors' intent to produce information contained in an agency's human source or intelligence file in discovery to the defense. Prosecutors should consult with a supervisor and/or the Discovery Coordinator before producing discovery over the objection of an agency.

When producing information from an agency's human source or intelligence file, prosecutors should consider whether alternate forms of production (rather than producing documents directly from the source file) are available to satisfy the prosecutor's discovery obligation.

#### 3. Evidence Obtained During the Investigation

Prosecutors should typically review all evidence obtained in the course of the investigation for potential discovery. These materials include evidence seized in search warrants, produced pursuant to subpoena, voluntarily produced by a witness, or otherwise collected during the investigation.

### 4. Substantive Communications

Prosecutors should typically request that all substantive communications generated during the investigation be preserved and reviewed.[5] These communications may take the form of reports, letters, notes, memoranda, emails, text messages, instant messages, social networking communications, and voice mails (many of which are now stored electronically). Parties to these communications may include prosecutors, agents, witnesses, victims, and/or the victim-witness coordinator. These communications may reside in files, computers, computer servers, cell phones, and personal digital assistants.

In evaluating whether and how to produce substantive communications in discovery, prosecutors should keep in mind that certain communications are potentially privileged or protected work product. Prosecutors therefore should consider the need to redact any privileged or purely logistical information from any substantive communications produced in discovery. Prosecutors also should consider the appropriateness of producing discoverable information contained in substantive communications in an alternate form, such as a letter to defense counsel, particularly when agency policy or practice disfavors disclosure of the communication in question.

For further guidance on electronic communications, prosecutors should consult Criminal Division Policy 10-06 (Use of Electronic Communications in Parallel and Criminal Proceedings).

### 5. Giglio/Henthorn

#### a. Federal Law Enforcement Officers

It is the policy of this office to request potential impeachment information regarding federal law enforcement witnesses directly from the investigative agency. This procedure is set out in Criminal Division Policy 97-03 (Henthorn Policy and Procedure).

In addition, prosecutors should typically conduct a limited inquiry of federal law enforcement witnesses regarding potential impeachment information that may not exist in the agency's personnel file. This inquiry shall consist of asking the following questions of the witness during pre-trial preparation:

1. *Have you ever been arrested, charged with, or convicted of a criminal offense?*

2. *Has any judge or prosecutor made any allegation or finding that you have testified falsely, submitted false information, or demonstrated bias in any proceeding?*

---

[5] "Substantive" communications include reports about investigative activity, discussions of the relative merits of evidence, characterizations of potential testimony, interviews of or interactions with victims and witnesses, and issues relating to credibility.

### b.     State and Local Law Enforcement Officers

Under Ninth Circuit case law, federal prosecutors have no obligation to seek or produce personnel information from state and local agencies about state and local law enforcement officers.[6] Further, California law prohibits state and local law enforcement agencies from disclosing material contained in law enforcement officers' personnel files absent compliance with certain statutory requirements.[7] These files are obtainable only by subpoena or motions in the Superior Court (known as "Pitchess" motions).[8] As a result, prosecutors are not, as a matter of course, expected or obligated to request impeachment information for a state or local law enforcement officer directly from the agency. Instead, prosecutors should typically conduct an inquiry of state law enforcement witnesses regarding potential impeachment information. This inquiry shall consist of the following questions:

1. *Have you ever been arrested, charged with, or convicted of a criminal offense?*

2. *Has any judge or prosecutor made any allegation or finding that you have testified falsely, submitted false information, or demonstrated bias in any proceeding?*

3. *Are you aware of any sustained findings in relation to past complaints, investigations, or disciplinary actions concerning the performance of your official duties?*

4. *Are you aware of any pending complaints, investigations, or disciplinary actions relating to the performance of your official duties or to any off-duty conduct?*

5. *Have you received any adverse publicity as a result of your on-duty or off-duty conduct?*

With respect to state and local law enforcement witnesses, prosecutors should typically ask these questions with enough lead time before trial to obtain additional information if follow-up is required due to positive or uncertain responses.

For both federal and state and local law enforcement officers, prosecutors should typically consult with the office's Henthorn coordinator before producing Henthorn materials in discovery and must ultimately notify the Henthorn coordinator of actual production. Prosecutors also should keep in mind that not all information learned pursuant to a Henthorn request is discoverable, and not all Henthorn information produced in discovery is admissible at trial. Prosecutors therefore should consider (1) submitting potential Henthorn information to the court in camera for a judicial determination of whether it is discoverable, (2) filing motions in limine to exclude Henthorn information that is discoverable but not admissible in evidence, and (3) seeking a protective order prohibiting the copying and further distribution of Henthorn information by defense counsel.

---

[6]     United States v. Dominguez-Villa, 954 F.2d 562, 565-66 (9th Cir. 1992); United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991); United States v. Gatto, 763 F.2d 1040, 1048-49 (9th Cir. 1985).

[7]     Cal. Penal Code §§ 832.7, 832.8; Cal. Evid. Code §§ 1043, 1045; Alford v. Superior Court, 29 Cal. 4th 1033, 1045 (2003).

[8]     See Pitchess v. Superior Court, 11 Cal.3d 531 (1974).

### C. What to Produce: Ensuring Discovery Compliance

As discussed in Section II above, a prosecutor's discovery obligations are set forth by Brady/Giglio and their progeny, Federal Rules of Criminal Procedure 16 and 26.2, and the Jencks Act (18 U.S.C. § 3500). As discussed in Section III above, this office will produce discovery beyond that required by law in most cases.

In addition, prosecutors should pay particular attention to the following recurring issues when ensuring the completeness of discovery production:

1. Rough Notes

**It is the policy of this office to produce the rough notes of a defendant's interview in discovery.** Rough notes of an agent's interview of a non-defendant witness generally are not discoverable unless they constitute Jencks Act statements (i.e. the witness has signed or otherwise adopted or approved the notes, or the notes contain a substantially verbatim recital of the witness's statement) or contain exculpatory or impeachment information not previously disclosed to the defense (in which case the substance of the statement, but not necessarily the actual rough notes, must be disclosed).

Prosecutors should request that agents preserve their rough notes of witness interviews. Prosecutors should typically ensure that all agents' rough notes of interviews of testifying witnesses are reviewed for discoverable information prior to trial.[9] A prosecutor familiar with the case should conduct this review if practicable. There are cases, however, where the volume and/or legibility of the rough notes requires a prosecutor to provide guidance to an agent conducting the review.

2. Reports of Interviews of Testifying and Non-Testifying Witnesses

Prosecutors should typically produce reports of interviews of testifying witnesses in discovery, even though such reports often do not contain a "statement" of the witness as defined by the Jencks Act (18 U.S.C. § 3500) or Federal Rule of Criminal Procedure 26.2. As discussed in section IV(D)(3) below, it is the general policy of this office to produce such statements at a time that facilitates a fair and efficient trial.

Prosecutors also should consider producing reports of interviews of non-testifying witnesses pursuant to the office's policy of providing broad discovery. In all events, prosecutors should carefully review the reports of interviews of non-testifying witnesses for exculpatory and impeachment information and ensure that any such information is disclosed to the defense.

3. Pre-Trial Witness Interviews

Pre-trial witness interviews often are not memorialized in a formal report of interview. Nevertheless, prosecutors must be alert to any discoverable information learned in those interviews. For example,

---

[9] Prosecutors should also consider whether the circumstances of a case require review of the rough notes of non-testifying witnesses. These circumstances may be present when (1) the agent did not prepare a written report of the interview, (2) the accuracy of the formal report is called into question, or (3) the non-testifying witness played an important role in the investigation.

prosecutors must disclose discoverable exculpatory information first learned in a pre-trial interview. Any statements that a witness makes during the pre-trial interview that are materially inconsistent with any previous statements made by the witness may be discoverable under Brady and/or Giglio. Similarly, any bias that the witness expresses against the defense or in favor of the prosecution during a pre-trial interview may be discoverable under Brady and Giglio.

It is not necessary to prepare a formal report in the event that discoverable information is learned in a pre-trial interview. But it is necessary to promptly notify the defense of the exculpatory and/or impeachment information through a letter to defense counsel or other method that can be documented and maintained in the case file.

### 4. Production of Sensitive Information

In certain cases, reports and other materials subject to production contain sensitive information. Sensitive information includes medical and mental health records, tax information, trade secrets, personal information (such as financial records and social security numbers), the names and addresses of certain witnesses, the existence and identity of cooperators and informants, communications between agents and agency counsel, agency policies, and information regarding ongoing investigations.

Prosecutors should redact sensitive information from discovery whenever possible and appropriate. In cases where redaction is not possible, prosecutors should typically apply to the court for a protective order prohibiting the further copying, dissemination, or disclosure of the sensitive information. In certain cases, it may also be appropriate to seek a protective order prohibiting the defense attorney from disclosing the sensitive information to the client. If redactions and/or protective orders may not effectively protect the sensitive information, the prosecutor should consider limiting the scope and timing of the discovery to that required by law.

Prosecutors dealing with sensitive information in discovery are encouraged to consult with their supervisor and/or the Discovery Coordinator. Consultation is required before producing communications between agents and agency counsel or agency policies in discovery.

### D. When to Produce: Ensuring Timely Production

It is the policy of this office to provide early discovery in most cases. The early production of discovery promotes the early resolution of cases, furthers an efficient trial in those cases that do not settle, and provides a margin of error in complying with our discovery obligations.

Below are guidelines for the timing of discovery:

### 1. **Brady, Giglio and Henthorn Discovery**

Prosecutors should disclose **exculpatory information** to the defendant **reasonably promptly after it is discovered** regardless of whether the information exists in a written form. Prosecutors should disclose **impeachment information of anticipated trial witnesses at a reasonable time before trial, or, if learned later, reasonably promptly after discovery.**

As a courtesy to our agency partners, prosecutors should typically send <u>Henthorn</u> requests three weeks before trial unless it is reasonably certain that the case will not proceed to trial on the date set. Prosecutors should typically produce discoverable **<u>Henthorn</u> material** and any other impeachment information relating to anticipated government witnesses **at a reasonable time before trial**, or, if the agency's <u>Henthorn</u> response comes later, reasonably promptly after receiving the information from the agency. Prosecutors are reminded, where practicable, to not produce <u>Henthorn</u> materials in discovery without first consulting the office's <u>Henthorn</u> coordinator.

2.   <u>Rule 16 Discovery</u>

Prosecutors should typically produce a **defendant's post-arrest statements** discoverable under Rule 16(a)(1)(A) and (B) and a **defendant's criminal history** discoverable under Rule 16(a)(1)(D) **reasonably promptly after arraignment on the indictment**. Prosecutors should typically produce **documents and objects** discoverable under Rule 16(a)(1)(E), **reports of examinations and tests** discoverable under Rule 16(a)(1)(F) and **expert notices** discoverable under Rule 16(a)(1)(G) **a reasonable time before trial, taking into account the complexity of the subject matter.**

3.   <u>Jencks Act Discovery</u>

To promote the prompt resolution of cases in which a fast-track offer is made, the Grand Jury unit typically will produce the available reports of inspectors involved in a seizure and/or arrest within one week of a defendant's initial appearance. In other cases, prosecutors should produce **Jencks Act** discovery **at a time that facilitates a fair and efficient trial.**

E.   **Maintaining a Record of Disclosure**

Documenting discovery compliance requires systematic and reliable record-keeping. Prosecutors therefore should maintain a record of the discovery produced to or inspected by the defense in the case file. This discovery log should contain information sufficient to identify with particularity what items were produced or made available for inspection and the dates on which the production or inspection occurred. Unless impracticable due to the volume or nature of the discovery, prosecutors should typically retain an exact copy of the discovery produced in the case file for future reference.

In large and complex cases, prosecutors should consider preparing and maintaining a written record documenting the preservation, collection, and review of potential discovery.

V.

## DISCOVERY COORDINATOR

This office shall have a criminal Discovery Coordinator appointed by the United States Attorney. This designated individual shall be a supervisor or Senior Litigation Counsel in the Criminal Division. The duties of this individual are to serve as a point of contact on criminal discovery issues, counsel prosecutors on discovery compliance, coordinate discovery training in the office, and, where appropriate, make suggestions to the United States Attorney for updates and revisions to this policy.